IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| ANITA LINDSEY, | ) | CASE NO. 1:18CV2158 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **MEMORANDUM OPINION & ORDER** |
| Defendant. | ) | |

Plaintiff Anita Lindsey ("Lindsey") seeks judicial review of the final decision of

Defendant Commissioner of Social Security ("Commissioner") denying her application for

Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI").  Doc. 1.  This

Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned

Magistrate Judge pursuant to the consent of the parties.  Doc. 13.

As set forth below, the ALJ did not sufficiently explain or support his decision with

respect to the opinion of Lindsey's treating physician, Dr. Tone, and Lindsey's use of an

assistive device.  Accordingly, the Commissioner's decision is **REVERSED and REMANDED**

for proceedings consistent with this opinion.

## I. Procedural History

In February 2015, Lindsey filed applications for DIB and SSI, alleging a disability onset

date of July 26, 2014.  Tr. 15, 1316.  She alleged disability based on the following: fecal

incontinence and osteoarthritis.  Tr. 1321.  After denials by the state agency initially (Tr. 1131,

1132) and on reconsideration (Tr. 1167, 1168), Lindsey requested an administrative hearing.  Tr.

1193.  A hearing was held before an Administrative Law Judge ("ALJ") in December 2016; that

ALJ subsequently became unavailable to adjudicate the claim and Lindsey had a second hearing before a different ALJ on December 15, 2017. Tr. 15, 1056-1112. In his February 28, 2018, decision (Tr. 15-29), the ALJ determined that there are jobs that exist in the national economy that Lindsey can perform, i.e., she is not disabled. Tr. 28-29. The Appeals Council denied Lindsey's request for review, making the ALJ's decision the final decision of the Commissioner. Tr. 1-4.

## II. Evidence

### A. Personal and Vocational Evidence

Lindsey was born in 1967 and was 47 years old on her alleged disability onset date. Tr. 27. She previously performed work as a hand packager, security guard, cashier, laborer, and nurse assistant. Tr. 27. She has a GED and last worked in 2014. Tr. 1065, 1077.

### B. Relevant Medical Evidence[1]

In February 2014, an x-ray of Lindsey's cervical spine showed limited discogenic disease at C4-5. Tr. 1583. She was diagnosed with cervical spondylosis without myelopathy; her other diagnoses at the time included benign hypertensive heart disease, insomnia, and chronic pain syndrome. Tr. 1583. She saw a pain management doctor, took medications, and her last visit was about four months prior. Tr. 1583.

On April 18, 2014, Lindsey visited the emergency room after she fell and injured her left knee. Tr. 1705. She also reported that her knees had been locking up for the past two days. Tr. 1705. An x-ray was normal and she was diagnosed with a knee sprain. Tr. 1703. On April 22, she followed up with pain management. Tr. 1703. Upon exam of her knee, she had mild

---

[1] In her brief, Lindsey details medical evidence that she submitted to the Appeals Council. Doc. 16, pp. 18-19; Tr. 2. The Appeals Council did not exhibit or consider this evidence relevant and, therefore, this Court does not consider it. *See Foster v. Halter*, 279 F.3d 348, 357 (6th Cir 2001) (evidence submitted after the ALJ's decision "cannot be considered part of the record for the purposes of substantial evidence review.") (citing *Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 148 (6th Cir 1996)).

swelling, no warmth compared to her right knee, tenderness, flexion and extension limited due to pain, negative stress tests, a positive McMurray's sign, patellar grind, and, in her upper and lower extremities, normal reflexes, sensation, and fine coordination. Tr. 1705. An MRI was ordered to rule out a meniscal injury and she was prescribed physical therapy for both knees, bilateral knee sleeves, Percocet, and an Ace bandage was applied. Tr. 1705. A few hours later she saw physical medicine and rehabilitation; she was noted to be a fall risk due to an unsteady/shuffling gait or crutch. Tr. 1703.

On May 5, Lindsey began physical therapy. Tr. 1701. Her status was full weight bearing and she reported bilateral knee pain worse with weight bearing. Tr. 1701. She reported difficulty with any activities that required her to stand still for an extended period of time. Tr. 1701. Upon exam, she had mild edema in her left knee and was wearing a brace on it, she had tenderness in both knees, decreased weight bearing on the left lower extremity, intact sensation, decreased range of motion in her left knee compared to her right, and decreased functional mobility. Tr. 1702. Her prognosis was good. Tr. 1702. By June 30 she ambulated with a normal gait and without an assistive device. Tr. 1695.

In July 2014 she visited her primary care physician for a blood pressure check. Tr. 1544. She reported that her Neurontin was not working as well as before for her neck and back pain. Tr. 1544. Upon exam, she had a decreased range of motion in her cervical spine and bony tenderness. Tr. 1546.

On August 12, 2014, Lindsey went to the emergency room for fecal incontinence. Tr. 1690. She followed up with a neurologist, who referred her to gastroenterology, whom she saw in September. Tr. 1685-1687; 1676-1678. She also was seen by urology and gynecology. Tr. 1620. She was diagnosed with fecal incontinence and prescribed incontinence supplies. Tr.

1664-1666, 1687.  She continued to visit the emergency room for this problem.  See, e.g., Tr. 1666.

At her final physical therapy appointment on December 19, her gait was grossly within functional limits and not antalgic.  Tr. 1631-1632.  Her left knee strength and range of motion was significantly improved and she had improved functional mobility patterns; her goal for pain was not met.  Tr. 1633.  She was discharged independent with her home exercise program and deemed capable of self-management with her home exercise program.  Tr. 1632.

On February 3, 2015, Lindsey received an epidural steroid injection to her cervical spine at level C6-7.  Tr. 1830.

On February 6, Lindsey saw internal medicine for a follow up and reported feeling down and asked to see a psychiatrist.  Tr. 1826.  She was taking Wellbutrin for smoking cessation and depression.  Tr. 1826.

On February 26, Lindsey visited the medical clinic for a follow up complaining of pain and fecal incontinence.  Tr. 1619.  Her incontinence was getting worse; she had a part-time job at McDonald's and she did not feel that she could "hold [her job] down for now" due to her symptoms.  Tr. 1619.  Upon exam, she had a normal, "not unsteady" gait that was slow due to pain.  Tr. 1620.  She was assessed with diffuse pain that did not seem to be related to her cervical spine problem for which she received injections.  Tr. 1620.  She had an upcoming rheumatology appointment.  Tr. 1620.  She requested a cane; a cane was ordered and she was referred to physical therapy to learn how to use the cane correctly.  Tr. 1620.

On March 11, 2015, Lindsey saw a rheumatologist complaining of body pain all over: back, arms, legs, feet, fingers.  Tr. 1616.  She sometimes could not get out of bed.  Tr. 1616.  It had been ongoing for two years on and off, worse with cold.  Tr. 1616.  She could not walk for

long distances and was unable to sit more than 20 minutes without shooting pain down her legs. Tr. 1616. She was tired all the time and did not sleep well. Tr. 1616. Upon exam, she had diffuse tender points, restricted range of motion of her neck and shoulders, and otherwise no limitations in the range of motion in her joints and no swelling or warmth. Tr. 1618. The rheumatologist felt she had a central sensitization syndrome with severe fatigue and multiple tender points suggesting fibromyalgia. Tr. 1618. She was recommended to exercise on a daily basis, improve sleep hygiene/have a sleep study, and consider switching antidepressants. Tr. 1618.

On March 16, 2015, Lindsey visited the pain management clinic; she was noted to be a fall risk due to her use of a cane. Tr. 1611. Upon exam, she had tenderness in her cervical spine with some evidence of spasm and muscle tightness, normal neck flexion and extension but rotation was limited due to pain. Tr. 1614. Her knees had mild swelling, no warmth, were tender to palpation, had a decreased range of motion due to pain, and a positive McMurray's sign and patellar grind test. Tr. 1614. Her sensation, motor strength, and fine coordination were normal. Tr. 1614. She was diagnosed with chronic bilateral knee pain secondary to degenerative changes and chronic cervical spine pain most likely due to degenerative changes and exacerbated by poor posture and muscle spasm. Tr. 1614.

On March 19, Lindsey underwent an endoanal ultrasound and urodynamics evaluation for urinary and fecal incontinence. Tr. 1790-1791, 1797. She was found to have a hypersensitive bladder of low normal bladder capacity and normal compliance; she was not a candidate for sphincteroplasty (a surgical procedure) and was diagnosed with mixed incontinence. Tr. 1790, 1798. The next day Lindsey saw her internal medicine doctor complaining of insomnia. Tr. 1787. She complained of new pain in both hands. Tr. 1787. Her physician noted that her

fibromyalgia was likely made worse with depression and, per the rheumatologist's recommendation, he switched Lindsey's antidepressant to Cymbalta. Tr. 1787.

On April 27, Lindsey underwent a hysterectomy, which she requested due to ongoing dysmenorrhea. Tr. 1774, 1780, 1783.

On May 22, 2015, Lindsey had a follow-up in the URO/GYN department and was doing well. Tr. 1762-1763. Then she had a neurology visit; her neurological exam was normal and she had a narrow-based, antalgic gait. Tr. 1768. The impression was fibromyalgia. Tr. 1769. The next day she had a pain management visit. Tr. 1758. She stated that she had lost the last Vicodin prescription she had received, but the provider found that it had been filled and that Lindsey had had two more prescriptions since then; therefore, the provider did not refill her prescription. Tr. 1759. Upon exam, she had tenderness of her cervical spine at C7 level, some evidence of spasm and focal muscle tightness; mild swelling of her knees; her left knee had pain on range of motion, tenderness to palpation, and a positive McMurray's sign; and her neurological exam was normal. Tr. 1762. The impression was bilateral knee pain secondary to degenerative changes and cervical spine pain most likely due to degenerative changes and exacerbated by poor posture and muscle spasm. Tr. 1762.

On May 28, she visited the emergency room for a fibromyalgia flare-up the past month with intermittent worsening. Tr. 1841. She received a morphine injection, which helped, and was discharged. Tr. 1841.

On June 16, she followed up with her primary care physician for chronic pain. Tr. 1754. Upon exam, she was tearful and had generalized tenderness to light touch in her back. Tr. 1755. She stated that her pain was worse and explained that, regarding the loss of her pain medication, after her recent surgery there had been many people in her home to help her and she believed that

one of them stole her medication. Tr. 1756. She was diagnosed with chronic pain and poor sleep and her medications were changed. Tr. 1756.

The same day, she had a psychiatric assessment and reported feeling "really down lately," having outbursts of anger, and wanting to choke someone. Tr. 2333. She was diagnosed with major depressive disorder, single episode, unspecified. Tr. 2334. She reported to a licensed social worker at The Center for Families and Children ("Center") on June 25 that she gets depressed and upset and takes it out on those trying to help her. Tr. 2337. She was having difficulty cooking at times and they looked into meal delivery services to help her. Tr. 2337.

On July 8, 2015, Lindsey went to the medical clinic reporting fibromyalgia pain all over; she explained that she ran out of her pain medication early because she had been taking 3 pills a day instead of 2. Tr. 2045. She asked for a prescription. Tr. 2045. Upon exam, she was in no acute distress. Tr. 2045. She stated that she had had a fall that week and requested a walker with a seat. Tr. 2048. The physician ordered the walker. Tr. 2048. On July 16, Lindsey reported to her counselor at the Center that she had fallen a few times since her last visit and that she had contacted her doctor for a walker. Tr. 2340.

On July 21, 2015, Lindsey underwent a formal psychological assessment after reporting depression and anger since her fibromyalgia diagnosis in March of 2015. Tr. 2329. She was diagnosed with "major depressive disorder related to medical condition versus major depression, PTSD." Tr. 2331. She reported receiving her walker and feeling more steady when she walked, although she did not like to use it; she also stated that she had more bad days resulting in increased depression. Tr. 2343. On July 31, Lindsey told her counselor that she was using her walker, admitted that she needed it, and had had fewer falls. Tr. 2344.

On August 5, 2015, Lindsey told her doctor that she was having difficulty getting on and

off the bus with her walker and that she was unable to stand for long periods of time. Tr. 2053. Her physician completed paperwork for the Regional Transportation Authority (RTA) so that Lindsey could be approved for a paratransit pass. Tr. 2053.

On August 7, Lindsey visited the emergency room again for chronic pain in her hips, knees, back, elbows, and shoulders. Tr. 1852. She was diffusely tender to light touch in multiple areas but had a normal range of motion. Tr. 1854.

On August 25, 2015, Lindsey underwent occupational therapy and physical therapy evaluations as part of a chronic pain rehabilitation program (CPRP) evaluation. Tr. 1882, 1891. Occupational therapy reported a fair rehab potential "due to fair motivation-self limiting, limited by chronicity of symptoms and multiple co-morbidities." Tr. 1887. Upon exam, she had decreased bilateral shoulder range of motion and strength, decreased bilateral hand grip, and she could lift no more than 13 pounds and carry no more than 8 pounds due to complaints of pain. Tr. 1887. She reported decreased tolerance for home tasks including self-care and taking care of her grandchildren who were 2-years old and weighed 20-25 pounds. Tr. 1883-1884, 1887. Physical therapy notes reported several Waddell's[2] signs and an antalgic and slow gait using a rollator. Tr. 1893-1894. She was found to have an increased risk of falls and it was recommended that she use her walker at all times. Tr. 1895. Lindsey also saw her counselor that day and reported having some bad days where it was very hard to walk or do anything and she was in pain a lot. Tr. 2355.

Lindsey was discharged from the CPRP on September 17, 2015. Tr. 2012. At the time of her discharge she could lift 25 pounds and could perform static standing for at least 30 minutes without increased pain. Tr. 2013. She was diagnosed with fibromyalgia, depression,

---

[2] Waddell's signs indicate that low back pain is intensified by psychological factors. *See* Dorland's Illustrated Medical Dictionary, 32nd Edition, 2012, at 1716.

PTSD by history, and a pain disorder with medical and psychological features. Tr. 2017.

On October 6, 2015, Lindsey saw Monica Tone, M.D., at the Center for a psychological evaluation. Tr. 2371-2373, 2430. She reported having had mood swings beginning in April of 2015 and reported experiencing diminished interest and concentration, weight gain from eating at night when she wakes up, sleep disturbance, panic attacks, high anxiety, passive thoughts of death, nightmares, hypervigilance, and difficulty with crowds and trusting others. Tr. 2371. Her grandchildren help bring her out of depression. Tr. 2371. Dr. Tone noted that significant depression and anxiety symptoms remain despite some improvement with taking Cymbalta, which had recently been increased. Tr. 2372. She experienced increased PTSD symptoms concurrent with increased reminders of abuse recently while going through the CPRP. Tr. 2372. Dr. Tone diagnosed major depressive disorder, recurrent severe; unspecified anxiety disorder; PTSD; and rule out bipolar. Tr. 2372. Lindsey returned to Dr. Tone on October 13 and reported that she felt like she was "outside of my body," a hyperstartle response and vivid dreams, and she had been hearing voices. Tr. 2377. She also reported tremors in her hands when nervous or stressed and "depersonalization and derealization symptoms." Tr. 2377. Dr. Tone adjusted and added to her medication regime. Tr. 2378. On October 20, Lindsey saw Dr. Tone and reported severe anxiety ("panic mode 24/7") and feeling depressed almost all the time, low energy and motivation, irritability, diminished concentration, out-of-body experiences twice a day, less auditory and visual hallucinations, nightmares, and recurrent intrusive thoughts during the daytime. Tr. 2380. The last three days she had had very severe head-to-toe pain. Tr. 2380. Dr. Tone adjusted her medications and attempted to contact pain management to coordinate care. Tr. 2381.

The next day (October 21) Lindsey visited pain management and reported pain "10+" on

a scale of 1-10.  Tr. 2039.  She stated that she had tripped and fallen in the past few days.  Tr. 2035.  Upon exam, she was in no acute distress, had an appropriate mood and affect, a guarded and decreased range of motion in her neck, diffuse myofascial tenderness to palpation in her cervical, thoracic and lumbar paraspinal muscles, negative straight leg raise testing, normal muscle tone, and a steady gait without assistance.  Tr. 2041.  The treatment note indicated that she had recently completed the CPRP but had not participated in aftercare.  Tr. 2041.  Due to the diffuse nature of her pain, there was no indication for procedural intervention and it was recommended she continue with CPRP aftercare and consult with a fibromyalgia clinic.  Tr. 2041.

On October 27, 2015, Lindsey saw Dr. Tone and reported having been very forgetful, having difficulty forming speech, very poor concentration, panic attacks 3-4 days a week, crying spells, depression 10/10, and period of helplessness and hopelessness.  Tr. 2383.  She was trying to distract herself by caring for her grandchildren but it wasn't working.  Tr. 2383.  Her auditory hallucinations had "toned down some."  Tr. 2383.

On October 31, 2015, Lindsey was admitted to the hospital with difficulty speaking and numbness.  Tr. 2058.  She was discharged on November 4, diagnosed with conversion disorder and fibromyalgia; she was ordered to stop Prozac due to serotonin syndrome risk.  Tr. 2060.  She was referred for speech and language therapy; the therapist assessed her with a mild cognitive-communicative impairment.  Tr. 2169.  The therapist noted that the symptoms she complained of were not noted to be impaired to a significant degree on exam but concluded that she would benefit from a short course of speech/language/cognitive therapy to address strategies for managing her symptoms when she experienced increased difficulty with communication.  Tr. 2169.

On November 10, Lindsey had a follow up appointment at a medical clinic; upon exam, she had a depressed affect and sometimes used a walker, but when it was not nearby she walked without problems.  Tr. 2254.

On November 11, 2015, Lindsey had a physical therapy evaluation for conversion disorder and lower extremity weakness.  Tr. 2173.  She was advised to use her cane in her right hand rather than left, which improved, but did not resolve, her left knee pain.  Tr. 2176.  Her gait was slow, antalgic, and wide-based.  Tr. 2176.  She was advised to use her rollator in the community and the cane at home.  Tr. 2177.  On November 16, Lindsey saw her counselor at the Center, who reported that Lindsey's voice was still very high pitched at times.  Tr. 2399.  Lindsey reported doing "okay."  Tr. 2399.  She reported using her cane instead of her walker and taking the normal bus instead of using para-transport.  Tr. 2399.  The next day, she was admitted to the hospital with a headache and left-sided weakness, likely due to conversion therapy and migraine headache.  Tr. 2182.  She was diagnosed with conversion disorder, fibromyalgia, difficulty walking, and migraine, and prescribed medication for migraines.  Tr. 2181.

On November 30, Lindsey had a follow-up; upon formal testing she had decreased strength in her upper and lower extremities; she was able to get on the exam table without any problems; and she was able to grip her cell phone and text without any problems.  Tr. 2219.  On December 2 she reported in a physical therapy session that she had had two falls in the last week: one walking with her walker on uneven grass alongside the road and one occurring when she turned to sit onto a seat on the bus; she lost her balance and "just kinda slid in."  Tr. 2223.  She walked with improved confidence and less pain when wearing a trial knee brace on her left knee.  Tr. 2223.  It was recommended that bilateral knee braces would provide her with increased stability while walking and decreased pain and they were ordered for her (her old ones no longer

fit).  Tr. 2224-2225.  She preferred to wait until she got her new knee braces before progressing in lower extremity strength and balance exercises.  Tr. 2225.  The same day she visited speech therapy and complained that she had been stuttering and falling more and that she "went to the emergency room again with stroke symptoms, but again no stroke."  Tr. 2227.  The therapist commented that Lindsey was not a candidate for speech therapy; that she was "not, in fact, stuttering but is able to express herself well.  Stress, depression, fatigue, and pain will worsen her expression."  Tr. 2228.

On December 3, 2015, Lindsey saw neurology for her migraines; they had improved on medication.  Tr. 2232, 2237.  She had a normal, straight gait and could heel and toe walk.  Tr. 2237.  The next day she saw pain management.  Tr. 2238.  Upon exam she had weakness, normal reflexes, abnormal muscle tone, and a normal gait.  Tr. 2241.  The note reads, "All muscles strength seems to be reduced but she walks fine w/ walker."  Tr. 2241.  She had hyperalgesia (abnormal increased sensitivity to pain) everywhere.  Tr. 2241.  She was assessed with fibromyalgia, chronic migraine, difficulty walking, and fecal incontinence.  Tr. 2242.

On December 18, 2015, Lindsey was taken to the emergency room after falling three times because her leg gave out.  Tr. 2502.  She was having back and leg pain and was dizzy and weak.  Tr. 2502.  She was diagnosed with chronic migraine, sequela of fall at home, and acute right hip pain.  Tr. 2505.  On December 24, 2015, she had a neurology follow-up complaining of tremors and speech issues.  Tr. 2494-2495.  Upon exam she had no rest tremor, mild rigidity left greater than right, and decreased arm swing in her gait.  Tr. 2497.  The impression was "parkinsonism related to meds in woman with mood issues."  Tr. 2497.

On February 3, 2016, Lindsey contacted the Center and reported that she was depressed, having just learned that her husband had pancreatic cancer, stage IV.  Tr. 2420.  A February 18

note from the Center references communication between Lindsey's case manager and counselor and states, "Still trying to figure out if client's mental health and physical symptoms are real. Client displays symptoms of whatever she is told by the doctor she might have." Tr. 2425.

On January 11, 2016, Lindsey visited the medical clinic requesting home health aid and a cane. Tr. 2487. She reported difficulties with activities of daily living (changing clothes, cooking, bathing) and traveling to her physical therapy appointments due to her Parkinson's disease. Tr. 2488. Upon exam, she had decreased strength in her upper and lower extremities, difficulty moving from sitting to standing, and tremors at baseline with limited grasp ability. Tr. 2489. A cane was ordered for her. Tr. 2489.

On January 28, 2016, Lindsey had a neurology/pain management appointment. Tr. 2434. The note states that she had failed to follow the CPRP aftercare program and follow up was recommended; the impression was a relapse of largely psychogenic symptoms. Tr. 2434-2435. On February 19, she had a rheumatology visit. Tr. 2439. She reported that her husband had just passed away two days prior. Tr. 2439. Upon exam, she had a flat affect and appeared depressed, she was hard to examine due to pain, she had excellent range of motion in her spine, and very tight muscles. Tr. 2442-2443. The assessment was severe fibromyalgia, failed CPRP; severe depressive and anxiety symptoms; a question of parkinsonism, referencing medications; and grieving. Tr. 2443. She was referred to aquatic physical therapy and a sleep study. Tr. 2443.

On March 2, 2016, Lindsey went to the emergency room for left sided hip pain worsening during the past week. Tr. 2457, 2460. Upon exam, she had a decreased left hip range of motion due to pain and tenderness. Tr. 2463. An x-ray found mild marginal acetabular osteophyte formation bilaterally. Tr. 2463, 2466. She refused a wheelchair upon discharge and "left ambulatory with cane without deficit." Tr. 2460.

Lindsey had a polysomnography (sleep test) on March 7 that showed mild obstructive sleep apnea, possible REM sleep behavior disorder, and an abnormal sleep architecture likely due to minor respiratory events, medications "and first night effect." Tr. 2455-2456.

Lindsey was admitted to the hospital from March 27 to 31, 2016, for pneumonia. Tr. 2720. She was discharged to a skilled nursing facility where she stayed until April 4. Tr. 2586, 2596. A fall risk assessment completed by the nursing home noted decreased mobility with an inability to attempt to balance without physical help. Tr. 2631. She had a mental health assessment on April 7; upon exam, her mood was depressed, anxious, overwhelmed, "feels 'sad.'" Tr. 2821. Her speech and thought processes were normal. Tr. 2821. She could perform all self-care independently. Tr. 2821. She was diagnosed with major depressive disorder, recurrent, severe without psychosis; and PTSD. Tr. 2822.

On April 15, 2016, Lindsey had a mental health assessment update with pharmacologic management. Tr. 2826. Upon exam, she had no obvious tremors, normal speech and thought processes, sustained concentration, and a depressed mood and blunted affect. Tr. 2831. She was diagnosed with PTSD and depression. Tr. 2831. On April 28, she had a neurology appointment; upon exam, she had hypomimia (reduced facial expression), no tremor, minimal left-sided muscular rigidity, normal sensation and reflexes, a normal, straight gait, and rapid alternating movement (RAM) slowed symmetrically. Tr. 2836, 2838. On May 9 she was anxious, had slowed speech and tangential thought processes, a depressed mood, impaired concentration with poor recent memory, and she reported auditory hallucinations. Tr. 2842. Her gait was unsteady and she used a walker. Tr. 2842.

Lindsey was admitted to the hospital from May 10 to May 11, 2016, complaining of tremors, increased falls, and fibromyalgia pain. Tr. 2844. The doctor reported that, when he

entered her room, she was lying comfortably on the bed talking on the phone with no tremors apparent but, upon seeing the doctor, Lindsey started shaking her legs and then arms.  Tr. 2854.  Her tremors were coarse and variable and improved with distraction.  Tr. 2854.  The doctor assured her that her tests were normal and discussed with her that her tremors were psychosomatic and linked to stress.  Tr. 2854.

At a neurology follow-up appointment on May 17, 2016, she was observed to have a mild tremor sitting in chair with wheeled walker and a flat affect.  Tr. 2886.  She was diagnosed with falls and assessed as her tremors likely being psychogenic and conversion disorder and possibly a mild effect of medication-induced Parkinson's.  Tr. 2890.  It was felt that she had a complex combination of underlying disorders and "caught between psych and neuro."  Tr. 2886.  The next day at a pain management visit she wobbled on Romberg testing, had a slight shuffle, and used her arms to rise out of the chair; she had a limited range of motion due to pain in her neck; a full range of motion with pain complaints in her shoulder, guarding, and tremors with motion; painful lumbar range of motion; and, in her knees, leg tremors with movement, muscle spasm, hamstring tightness, and fine crepitus bilaterally.  Tr. 2896.  She was assessed with chronic pain of multiple joints, balance disorder and falls.  Tr. 2896.

On May 26, her mental status exam findings showed cooperative, anxious, appropriate behavior; logical, organized, racing thoughts; paranoid thought content with fearfulness; reported visual hallucinations, guilt, irritability, isolation; and an unsteady gait with use of a cane.  Tr. 2901.

On June 8, Lindsey had a physical therapy evaluation for her frequent falls.  Tr. 2905.  It was found that her weakness of hip musculature, muscle tremors, and pain were the most limiting factors contributing to her decreased functional mobility and increased occurrence of

falls. Tr. 2909. Her gait was independent with a rolling walker, slow, and with flexed trunk and decreased bilateral dorsiflexion during swing phase causing her to shuffle her feet. Tr. 2909. Her gait speed and testing indicated that she was a moderate to high risk for falling and she would benefit from lower extremity strengthening and balance training. Tr. 2909. Her prognosis was good. Tr. 2909. The next day she lost her balance and fell into the wall in an elevator and went to the emergency room for elbow and knee pain. Tr. 2911. Upon exam she had full muscle strength, intact range of motion, a steady gait, and tenderness to her left elbow and knee. Tr. 2912.

On June 28, Lindsey had a rheumatology appointment; she had multiple tender points and full range of motion without pain. Tr. 2957. She was assessed with fibromyalgia and advised to consider a sleep clinic, increase her Lyrica, and have aquatic therapy. Tr. 2957. The next day at a pain management visit Lindsey had an antalgic gait and used a cane, wobbled on Romberg testing, used her arms to rise out of the chair, had a slight shuffle, a limited range of motion in her neck due to pain, full range of motion in her shoulders with pain, tremors and guarding, lumbar pain upon flexion and extension, and, in her knees, tremors with movement, muscle spasm, hamstring tightness, and fine crepitus bilaterally of the knees. Tr. 2963-2964.

On July 1, 2016, Lindsey had a psychological medication management visit and reported that she had been keeping her grandchildren, including a 3-year old, and it had been difficult. Tr. 2965-2966. Upon exam, she reported auditory and visual hallucinations, a "crappy" mood, poor energy, low motivation, irritability, and isolating; she had a constricted affect, impaired attention and concentration, poor recent memory and an unsteady gait using a cane. Tr. 2966. The impression was "grieving the loss of her husband" and she was diagnosed with major depression, recurrent, severe, and PTSD. Tr. 2966.

Lindsey was hospitalized from July 20 to July 24, 2016, for rectal bleeding (loose stools with blood clots). Tr. 3002, 3039. She was assessed with hematochezia, likely due to rectal hemorrhoids per a colonoscopy. Tr. 3061.

On July 27, 2016, Lindsey had a pain management visit; upon exam, her gait was slow with a cane, she had neck pain with limited range of motion; full range of motion in her shoulders with pain, tremors and guarding; lumbar pain upon flexion and extension; and, in her knees, tremors with movement, muscle spasm, hamstring tightness, and fine crepitus bilaterally of the knees. Tr. 2989. On August 5, she had a neurology appointment. Tr. 2981. She reported that her tremors were now causing difficulty with daily activities such as dressing. Tr. 2986. Upon exam, her muscle bulk was "ok," she had minimal left muscular rigidity, 4/5 strength due to poor effort, no tremors noted, slowed, symmetric RAM, and a normal, straight gait. Tr. 2986. She was started on Cogentin. Tr. 2986. On August 31, she was diagnosed with gait disturbance and frequent falls and was given a prescription for new wheels on her rollator. Tr. 2979.

On September 13, 2016, Lindsey had a psychiatry medication management appointment. Tr. 2968. She reported babysitting her grandchildren on the weekends, which she found tiring. Tr. 2969. Upon exam, she was withdrawn, had normal speech and thought processes but paranoid thought content. Tr. 2969. There was no evidence of perceptual disturbances, she had a depressed mood with constricted affect, impaired attention and concentration, and an unsteady gait using a cane. Tr. 2969. At a neurology appointment on November 4 she had occasional tremor, decreased strength, impaired rapid alternating movement, and a stable gait. Tr. 3107-3108. At a medication management appointment on December 8 she was cooperative but guarded, had logical, organized, racing thoughts, no evidence of paranoia or delusions, visual hallucinations (shadows), rated her mood as "funky," endorsed feelings of guilt, irritability, and

isolation, had a constricted affect, poor attention and concentration, and an unsteady gait. Tr. 3091.

On December 21, 2016, Lindsey visited pain management; upon exam, she rated her pain 10/10, was pleasant and in no acute distress, had a normal mood and affect, tenderness to palpation diffusely in her bilateral trapezius, cervical, thoracic and lumbar paraspinals, and full strength in her lower legs. Tr. 3084, 3088. She was diagnosed with fibromyalgia and osteoarthritis of the cervical spine. Tr. 3089. A cervical spine x-ray was taken and it showed degenerative changes of the cervical spine with disc space narrowing from C4 to C7 with marginal osteophytes at multiple levels. Tr. 3130.

On January 26, 2017, Lindsey went to a medication management appointment and reported it was a tough time for her due to the upcoming one-year anniversary of her husband's death. Tr. 3153. She stated that she was going to start seeing her counselor again. Tr. 3153. Upon exam, she was cooperative and appropriate, had logical, organized, racing thoughts, reported auditory and visual hallucinations, described her mood as "blah" and rated it a 2, endorsed low motivation, guilty feelings, irritability, and isolation, had impaired attention and concentration, poor recent memory, and an unsteady gait with use of a walker. Tr. 3153.

From February 7 to February 11, 2017, Lindsey was admitted to the hospital due to diffuse pain. Tr. 3168, 3171. She reported passing out twice due to pain. Tr. 3168. Upon exam, she had normal strength and tremors in her upper and lower extremities. Tr. 3169. A complete psychiatric evaluation was performed and noted that Lindsey had a difficult time during the assessment due to her fibromyalgia acting up. Tr. 3363. Upon exam she appeared unhappy, sad looking, and irritable. Tr. 3366. She had a sad demeanor and depressed mood conveyed by body posture and attitude. Tr. 3366. Her affect was appropriate and mood

congruent, there were no signs of hallucinations, and her thought process and content was normal.  Tr. 3366.  She was diagnosed with major depressive disorder, recurrent, moderate, and PTSD.  Tr. 3366.  On February 10 she walked slowly with a steady gait using a wheeled walker.  Tr. 3195.  Significant findings upon her discharge were severe depression with prolonged bereavement, she was not found to have Parkinson's and her Cogentin medication was likely contributing to her falls, and her Vitamin D and B12 levels were critically low.  Tr. 3172.  She was ordered to stop Cogentin and her medications were adjusted.  Tr. 3172.

On February 21, 2017, Lindsey had a medication management appointment; upon exam her behavior was appropriate, she had normal thought process and content, her mood was "so-so" and she rated it a 4, her concentration was impaired, she had poor recent memory, and an "unsteady gait - using walker."  Tr. 3325.  At a pain management visit on May 3 she rated her pain 10/10 and was pleasant, in no acute distress, and had a normal mood and affect.  Tr. 3334.  She was diffusely tender to palpation in her bilateral trapezius, cervical, thoracic and lumbar spine and paraspinal muscles, full strength in her upper and lower limbs, and a positive Hoffman's sign.  Tr. 3334-3335.  She was diagnosed with osteoarthritis and degenerative disc disease in her cervical region, fibromyalgia, and "falls, initial encounter."  Tr. 3335.  She had an MRI of her cervical spine which showed mild congenital spinal canal narrowing and spondylosis and neural foraminal narrowing at multiple levels including severe right narrowing at C5-6.  Tr. 3338.

At a medication management appointment on May 9, 2017, Lindsey was anxious, withdrawn, had racing thoughts, reported visual hallucinations, had a depressed mood, endorsed guilt, irritability, and isolation, and had a constricted affect, short attention and concentration, poor recent memory, and a steady gait.  Tr. 3342.

On July 12, 2017, pain management referred Lindsey for a cervical epidural steroid injection. Tr. 3434.

On August 9, 2017, Lindsey went to the emergency room for chest pain and was diagnosed with chest wall pain. Tr. 3453.

### C. Opinion Evidence

#### 1. Treating Source Opinion

On March 1, 2016, Lindsey's psychiatrist, Dr. Tone, completed a Mental Impairment Questionnaire. Tr. 2430-2433. Dr. Tone wrote that Lindsey had seen her every 3 to 4 weeks since October 6, 2015. Tr. 2430. She listed her diagnoses (major depressive disorder, recurrent, severe; PTSD; unspecified anxiety) and noted that so far Lindsey's depression and anxiety had remained refractory to treatment and remained very impairing. Tr. 2430. Dr. Tone listed the clinical findings that demonstrated the severity of her symptoms as highly anxious and depressed, speech latency, and impaired cognition (especially attention and concentration). Tr. 2430. Her prognosis was poor. Tr. 2430. Dr. Tone opined that Lindsey's psychiatric condition was exacerbated by her chronic pain due to fibromyalgia that is worsened by stress, depression and anxiety. Tr. 2432. She opined that Lindsey had marked limitations in her activities of daily living and extreme limitations in maintaining social functioning, maintaining concentration, persistence, or pace, and four or more episodes of decompensation within a 12-month period, each of at least a two-week duration. Tr. 2432. She concluded that Lindsey had a complete inability to function independently outside of her home and that an even minimal increase in mental demands or change in environment would be predicted to cause her to decompensate. Tr. 2433. She would be absent from work more than 4 days a month and was not a malingerer. Tr. 2433.

### 2. Consultative Examiner

On September 8, 2015, Lindsey saw Alison Flowers, Psy.D., for a psychological consultative exam. Tr. 1868-1878. Dr. Flowers stated that the exam results should be interpreted with caution because Lindsey had a tendency to give up quickly and appeared somewhat apathetic and it was unclear if this was only related to pain. Tr. 1873. Dr. Flowers diagnosed major depressive disorder, single episode, mild, and PTSD. Tr. 1876. She opined that Lindsey was likely able to perform multi-step tasks and to carry out and understand instructions. Tr. 18-77-1878.

On May 4, 2017, Lindsey saw Dorothy Bradford, M.D., for a physical consultative examination. Tr. 3141-3148. Upon exam, she had a normal station and posture but a slowed gait and used a walker, decreased range of motion in hips, knees, shoulders, lumbar spine and neck, intact sensation and reflexes, and a "right resting tremor." Tr. 3147. Dr. Bradford opined that Lindsey did not appear to be a fall risk but was dependent on her walker for fall prevention and support. Tr. 3148.

### D. Testimonial Evidence

#### 1. Lindsey's Testimony

Lindsey was represented by counsel and testified at the administrative hearing. Tr. 1057. At the outset, the ALJ asked if there was a prescription anywhere in the record for an assistive device and Lindsey's attorney explained that Lindsey requested the walker and the doctors wrote the orders. Tr. 1062. The attorney provided the record citations for doctors' orders for a cane and a walker. Tr. 1063.

Lindsey was standing at the beginning of the hearing and explained that she had pain in her lower back. Tr. 1064. When she sits down, it shoots up to her neck. Tr. 1064. She can only

stand for about 20 minutes and sit for about 20 minutes due to pain.  Tr. 1064.

Lindsey lives in an apartment; she lives alone but her boyfriend comes over to help her throughout the day.  Tr. 1065.  At least four days out of the week she needs help putting on her clothes.  Tr. 1065.  She needs help because of her fibromyalgia and the pain in her back and neck.  Tr. 1065.  Sometimes it gets unbearable and she can only subdue the symptoms.  Tr. 1065.  Her biggest challenge is her neck, spine, and when her fibromyalgia is up to a point where she can't stand to have anything touch her.  Tr. 1065.

Lindsey's four grown children also help her.  Tr. 1066.  She used to babysit her grandchildren; she has 10 grandchildren and they range in ages from 4 to 11.  Tr. 1069.  The last time she babysat was four months prior to the hearing.  Tr. 1066.  She was babysitting two grandchildren; they were 7 and 5 years old.  Tr. 1067.  They would usually come on a Thursday and stay until Sunday.  Tr. 1068.  Up until nine months prior to the hearing she would try to watch six grandchildren every other weekend.  Tr. 1069-1070.  She stopped babysitting because she couldn't get a handle on her pain.  Tr. 1066.  Her fibromyalgia flares up because you have to stay moving; she knows that is the best medicine for it but staying moving hurts.  Tr. 1066.  She still babysits; she had watched two grandchildren over a long weekend the month before the hearing.  Tr. 1066.  Her boyfriend helps out if he is there.  Tr. 1066.

Lindsey has never had a driver's license; she considered getting one in 2015 but decided not to because of the tremors in her hands and her reflexes.  Tr. 1076.  She typically gets around using public transportation.  Tr. 1076.  She took the bus to the hearing.  Tr. 1076.  If her boyfriend is not around to cook she will do it but she has to take rest breaks; she sits on her walker seat.  Tr. 1091.  And, because she has tremors in her hand, she drops a lot of things; this past summer she dropped a cast iron skillet full of hot grease on the floor.  Tr. 1091.  She no

longer stands up and actually cooks although she may put something in the microwave. Tr. 1091. Her family or boyfriend does her laundry and her brother usually takes her to the grocery store. Tr. 1091. In the store she uses her cane and leans against the cart. Tr. 1091. She uses a motorized scooter if its available. Tr. 1091. She can walk about a block with her cane and if its farther than that she takes her rolling walker with her because she has to sit down and rest. Tr. 1094.

Lindsey stated that she is unable to reach above her head with her right arm and she can sometimes get something out of a kitchen cupboard above the counter. Tr. 1094. Due to tremors, she would be unable to hold a soda can steady for long. Tr. 1095. That morning she got up to get a glass of milk and before she knew it the milk was all over the floor. Tr. 1095. Her hand just gives way and has been doing so for about a year. Tr. 1095. For pain, she is taking Lyrica and Percocet. Tr. 1096.

When asked why she believes she is disabled, Lindsey stated that she is not able to take care of herself very often and she has become dependent upon her walker. Tr. 1088. Her mental state is really bad because she is still dealing with her husband's death. Tr. 1089. She cannot do the things she used to do. Tr. 1089.

## 2. Vocational Expert's Testimony

A Vocational Expert ("VE") also testified at the hearing. Tr. 1098-1110. The ALJ asked the VE to determine whether a hypothetical individual of Lindsey's age, education and work experience could perform work if that person had the limitations assessed in the ALJ's RFC determination, and the VE answered that such an individual could not perform Lindsey's past work but could perform other jobs with significant numbers in the national economy such as inspector and hand packager, electronics worker, and assembler of small products. Tr. 1102.

### III. Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations. The five steps can be summarized as follows:

1. If claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[3] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the

Commissioner at Step Five to establish whether the claimant has the vocational factors to

perform work available in the national economy. *Id.*

## IV. The ALJ's Decision

In his February 28, 2018, decision, the ALJ made the following findings:

1.  The claimant meets the insured status requirements of the Social Security Act through December 31, 2019. Tr. 17.

2.  The claimant has not engaged in substantial gainful activity since July 26, 2014, the alleged onset date. Tr. 17.

3.  The claimant has the following severe impairments: degenerative disc disease of the cervical spine, degenerative joint disease of the bilateral knees, osteoarthritis, obesity, chronic pain disorder, fibromyalgia, asthma, obstructive sleep apnea, mixed incontinence, depression, anxiety, posttraumatic stress disorder (PTSD), and conversion disorder. Tr. 17.

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. Tr. 19.

5.  The claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b), subject to the following: she can lift and/or carry 20 pounds occasionally and 10 pounds frequently; she can sit, stand, or walk for 6 hours each per 8-hour workday; she can occasionally climb ramps and stairs, and occasionally balance, stoop, kneel, crouch and crawl; she cannot climb ladders, ropes, or scaffolds; she can perform occasional overhead reaching bilaterally; she can perform no greater than frequent reaching in other directions with the right upper extremity; she must avoid hazards such as unprotected heights and moving mechanical machinery; she cannot perform

---

[3] The DIB and SSI regulations cited herein are generally identical. Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq. The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

commercial driving; she can perform frequent handling, fingering, and feeling; she can tolerate frequent exposure to extreme cold, extreme heat, humidity, wetness, dust, odors, fumes, and pulmonary irritants; she can tolerate occasional exposure to slippery, uneven, or vibrating surfaces; she can perform simple routine tasks and make simple work-related decisions; she can tolerate a relatively static work environment, meaning one with no more than occasional change and such changes being explained in advance; she can tolerate a work environment that does not include strict production requirements or fast pace; and she would be off task for up to 5% of any given workday beyond normal breaks.  Tr. 22.

6.    The claimant is unable to perform any past relevant work.  Tr. 27.

7.    The claimant was born in 1967 and was 47 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date.  The claimant subsequently changed age category to closely approaching advanced age.  Tr. 27.

8.    The claimant has at least a high school education and is able to communicate in English.  Tr. 27.

9.    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferrable job skills.  Tr. 27.

10.   Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.  Tr. 27.

11.   The claimant has not been under a disability, as defined in the Social Security Act, from July 26, 2014, through the date of this decision.  Tr. 28.

## V. Plaintiff's Arguments

Lindsey alleges three errors in the ALJ's RFC assessment: failure to follow the treating physician rule with respect to Dr. Tone's opinion; failure to properly evaluate whether Lindsey's use of a cane was medically necessary; and failure to find her disabled due to pain caused by fibromyalgia.  Doc. 16, pp. 23-36.

## VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record. 42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.,* 889 F.2d 679, 681 (6th Cir. 1989) (per curiam) (citations omitted)). A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

### A. The ALJ did not sufficiently explain his reasons for assigning "less" weight to Dr. Tone's opinion

Lindsey argues that the ALJ violated the treating physician rule with respect to the opinion of Dr. Tone. Doc. 16, p. 23. Under the treating physician rule, "[a]n ALJ must give the opinion of a treating source controlling weight if he finds the opinion well supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in the case record." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); 20 C.F.R. § 404.1527(c)(2). If an ALJ decides to give a treating source's opinion less than controlling weight, he must give "good reasons" for doing so that are sufficiently specific to make clear to any subsequent reviewers the weight given to the treating physician's opinion and the reasons for that weight. *Wilson*, 378 F.3d at 544. In deciding the weight given, the ALJ must consider factors such as the length, nature, and extent of the treatment relationship; specialization of the physician; the supportability of the opinion; and the

consistency of the opinion with the record as a whole. *See* 20 C.F.R. § 416.927(c); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 747 (6th Cir. 2007).

The ALJ considered Dr. Tone's opinion as follows:

> I also afford less weight to the treating source statement of Monica Tone, M.D., which was dated within weeks of the unfortunate passing of the claimant's spouse (exh. 16F). The claimant, by her own reporting, naturally experienced an increased period of stress during that time. She subsequently was able to interact with others sufficiently and leave the house for multiple appointments. Furthermore, the assessment that the claimant required a highly supportive living arrangement is not consistent with the evidentiary record.

Tr. 26.

Lindsey argues that the ALJ erred because his conclusions are not consistent with the record evidence and there are no citations to support the ALJ's vague statements. Doc. 16, p. 24. The Court agrees that more explanation by the ALJ is needed before the Court is able to determine whether the ALJ's conclusions are consistent with the record evidence. For example, the ALJ does not identify the evidence he found inconsistent with a highly supportive living arrangement, and Lindsey testified at the hearing that she has help from her boyfriend and her children, including help getting dressed. Tr. 23, 1065-1066, 1091. This infirmity is not cured by the ALJ's discussion of the evidence earlier in his decision because there, too, the ALJ did not sufficiently detail the evidence of record and explain any conclusions he may have reached that could logically be linked to support his explanation of the weight he gave to Dr. Tone's opinion.

**B. The ALJ's explanation and cited evidence does not support his decision regarding Lindsey's use of an assistive device**

Lindsey argues that the ALJ failed to properly evaluate whether her use of a cane was medically necessary. Doc. 16, p. 28. "[T]he Sixth Circuit has held that if a cane is not a necessary device for the claimant's use, it cannot be considered a restriction or limitation on the plaintiff's ability to work." *Murphy v. Astrue*, 2013 WL 829316, at *10 (M.D.Tenn. March 6,

2013) (citing *Carreon v. Massanari*, 51 Fed. App'x 571, 575 (6th Cir. 2002)); *Cruz-Ridol*

*Carreon v. Comm'r of Soc. Sec*., 2018 WL 1136119, at *15 (N.D.Ohio Feb. 12, 2018), *report*

*and recommendation adopted*, 2018 WL 1083252. To be considered a restriction or limitation, a

cane "must be so necessary that it would trigger an obligation on the part of the Agency to

conclude that the cane is medically necessary," *i.e*., the record must reflect "more than just a

subjective desire on the part of the plaintiff as to the use of a cane." *Murphy*, 2013 WL 829316,

at *10 (internal citations omitted). "If the ALJ does not find that such device would be medically

necessary, then the ALJ is not required to pose a hypothetical to the VE." *Id*. Generally, an

ALJ's finding that a cane or other assistive device is not medically necessary is error when the

claimant has been prescribed an assistive device and the ALJ did not include the use of the

device in the RFC assessment without providing an explanation for the omission. *Cruz-Ridolfi*,

2018 WL 1136119, at *15 (quoting *Watkins v. Comm'r of Soc. Sec*., 2017 WL 6419350, at *11

(N.D. Ohio Nov. 22, 2017), *report and recommendation adopted*, 2017 WL 6389607).

Here, the ALJ found that there was no evidence that Lindsey's rollator or cane were

prescribed by a physician and no description of the circumstances for which it is needed. Tr. 24

(citing SSR 96-9p). However, it appears that physicians did in fact order Lindsey's assistive

devices. See Tr. 1620 (Karthik Kode, M.D., placing an order for a cane); Tr. 2489 (order for a

walking cane by Alok Tripathi, M.D.); Tr. 2048 (order for a walker with seat (upon Lindsey's

request) by Ekaterina Alchitis, M.D.). And a physician prescribed her new wheels for her

rollator. Tr. 2979 ("Prescription given for the changing the wheels on her rolator." [sic] by Raju

Nygi, M.D.). Moreover, her physical therapists advised she use the rollator in the community

and her cane at home (Tr. 1277) and "at all times" (Tr. 1895). In short, there is evidence of a

prescription of an assistive device and a description of circumstances for which it is needed.[4]

Moreover, the ALJ's recitation of the medical evidence regarding Lindsey's gait is not entirely accurate. For instance, the ALJ stated, "the record … indicates that the claimant's gait improved when she did not know she was being observed (see, e.g., exhs. 7F, 10F p. 54, 11F, 12F p. 132; see also exh. 28F p.8)." Tr. 24. Exhibits 7F and 11F are 26 and 22 pages long, respectively; the ALJ did not cite a specific page number supporting his statement and a review of these records does not appear to support the ALJ's statement. Exhibit 12F, p. 132 (Tr. 2175) only states that Lindsey arrived for her physical therapy appointment "ambulating independent in activity" and that she was given a straight cane. Tr. 2175. The next page states that she "ambulated with straight cane with no assistance," her gait had a slow cadence, wide base of support, and was antalgic, and she was taught the proper way to use her cane. Tr. 2176. These observations do not show that her gait improved when she did not know she was being observed. Exhibit 28F, p. 8 is an observation upon exam that Lindsey used a walker and had a slow gait; this treatment note does not support the ALJ's statement. Exhibit 10F, p. 54 (Tr. 1935) is a physical therapy note that states that Lindsey's gait quality was better when she did not know she was being observed versus when formally tested. Tr. 1935. Thus, of the five records cited by the ALJ, only one supports his statement; the other four do not.

Next, the ALJ's reliance upon frequent benign objective exam findings as to strength, range of motion, and sensation (without record citations) as a reason to discount Lindsey's use of an assistive device ignores the fact that Lindsey had been found to have decreased balance (e.g., Tr. 1895, 2896), complained frequently of severe pain, and had been assessed with falls and

---

[4] The ALJ states, "there is no specific description from an acceptable medical source of the circumstances in which a cane or a rollator is required[.]" Tr. 24. SSR-96-9p is silent as to the type of medical source (acceptable or non-acceptable), referring only to "medical documentation establishing the need for a hand-held assistive device to aid in walking or standing, and describing the circumstances for which it is needed." 1996 WL 374105, at *7. Moreover, although a physical therapist is not an "acceptable medical source," an ALJ is still required to consider opinions of non-acceptable medical sources.

tremors, which were likely psychogenic and conversion disorder and a possible mild effect of medication-induced Parkinson's. Tr. 2890. In other words, the record evidence, on its face, indicates more reasons for Lindsey's use of an assistive device beyond strength and range of motion testing and more than just a subjective desire on the part of Lindsey as to the use of an assistive device. Further explanation by the ALJ is required.

Finally, the ALJ remarked that the VE had testified that "even if the use of an assistive device such as a cane or rollator was included in the [RFC] of a hypothetical individual with the claimant's same vocational profile, it would not have affected his testimony regarding the availability of representative occupations in the national economy." Tr. 24. This is incorrect. While true that the VE testified that the use of a cane or walker *when walking* would not have an effect on the kind or number of jobs, the VE testified that the use of a cane or walker when standing and balancing would. Tr. 1106-1107. Thus, the ALJ's finding with respect to Lindsey's use of an assistive device could not be considered harmless error.

In short, the ALJ's explanation of why a cane or walker was not medically necessary is not supported by the evidence he cited, is lacking necessary detail and explanation, and must be reevaluated.

### C. The ALJ did not err when considering Lindsey's complaints of pain due to fibromyalgia

Lindsey argues that the ALJ erred when he did not find her disabled by pain due to fibromyalgia. Doc. 16, p. 33. She asserts that, although the ALJ acknowledged she had fibromyalgia, he also commented that she generally had a normal range of motion and strength. Tr. 23. As Lindsey points out (Doc. 16, pp. 34-35), "[p]hysical examinations [of a fibromyalgia patient] usually yield normal findings in terms of full range of motion, no joint swelling, normal muscle strength, and normal neurological reactions." *Swain v. Comm'r of Soc. Sec.*, 297

F.Supp.2d 986, 990 (N.D.Ohio 2003). However, the ALJ's consideration of Lindsey's complaints of pain did not stop with observing she had generally normal objective exam findings. The ALJ also commented that Lindsey sought treatment on numerous occasions for pain but missed follow up appointments and "had a disconcerting history of specifically asking for pain medication such as narcotics when treatment providers have not found it necessary." Tr. 25. The ALJ also observed that Lindsey's complaints of pain "have been described as being '10/10', '10+/10', '15/10' and beyond '10/10' on multiple occasions" while she was also consistently observed as functioning independently and exhibiting no distress on corresponding physical examinations. Tr. 25. Lindsey does not challenge the findings or reasoning of those portions of the ALJ's decision. The ALJ did not err when considering Lindsey's complaints of pain due to her fibromyalgia.

## VII. Conclusion

For the reasons set forth herein, the Commissioner's decision is **REVERSED AND REMANDED** for proceedings consistent with this opinion.[5]

IT IS SO ORDERED.

Dated: October 4, 2019

*/s/ Kathleen B. Burke*

_____

Kathleen B. Burke
United States Magistrate Judge

---

[5] This opinion should not be construed as a recommendation that, on remand, the ALJ find Lindsey disabled.